UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ST. LOUIS HOUSING AUTHORITY )
ex rel. JAMISON ELECTRIC, LLC, )
 )
   Plaintiff, )
 )
   vs. )   Case No. 4:12 CV 1746 CDP
 )
HANKINS CONSTRUCTION CO., )
and FIDELITY AND DEPOSIT CO. )
OF MARYLAND, )
 )
   Defendants. )

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

This construction case was tried to the court in a seven-day bench trial.

Plaintiff Jamison Electric LLC is an electrical subcontractor who performed work

on the renovation of an apartment building owned by the St. Louis Housing

Authority.   Jamison brings claims against the general contractor, Hankins

Construction Co., and Hankins' surety, Fidelity and Deposit Co. of Maryland.

Jamison asserts that Hankins breached the Jamison-Hankins subcontract by

accelerating the work and failing to pay a number of invoices for extra work.   It

also seeks damages for violation of Missouri's Prompt Payment Act.   Jamison

seeks to recover against the surety for the same claims and for vexatious refusal to

pay.   Hankins has counterclaimed, seeking damages from Jamison for delaying

the work and for failing to perform certain work required under its subcontract.

Based on the evidence presented by the parties and the law, I conclude that Jamison has shown Hawkins breached the contract by not paying for two items of extra work and by withholding payment on the contract balance.   Jamison, however, also owes Hankins for some work that it refused to perform.   Neither Jamison's claim for damages for acceleration nor Hankins' claim for damages for delay are supported by the evidence.

Because Jamison did not strictly comply with the terms of the payment bond, I conclude that neither Hawkins nor the surety is liable for breaching that contract.   Because of the numerous good-faith disputes regarding extra work, Jamison has failed to show that the surety is liable for vexatious refusal to pay or that Hankins violated the Prompt Payment Act.   Finally, I do not believe either party has completely prevailed in this case, so I will not award attorneys' fees to either.   My findings of fact and conclusions of law follow.

## I.     FINDINGS OF FACT

The St. Louis Housing Authority contracted with defendant Hankins Construction Co. to modernize a ten-story public housing apartment building known as the James House.   Hankins then subcontracted the electrical portion of that work to plaintiff Jamison Electric.   Defendant Fidelity & Deposit Co. of Maryland was Hankins' surety, having issued a payment bond on the project.

The current owners of Jamison, Brian and Bruce Hundelt, had previously owned a contracting company called Consolidated Electrical and Maintenance, Inc. Consolidated had submitted a bid to be an electrical subcontractor for the James House renovation project in an earlier bid process. During that process the St. Louis Housing Authority did not select any of the submitted bids, but instead later solicited a second round of bids, which resulted in the contracts at issue here.

In the fall of 2009 and spring of 2010, the Hundelts, through a holding company, purchased Jamison Electric. On January 22, 2010, now acting as Jamison, they submitted a preliminary bid to Hankins for the same work, in the same amount they had previously bid, $1,430,000. Several days later, Jamison and Hankins engaged in further negotiations. On January 27, 2010, Jamison lowered its bid for the electrical work to $1,309,000. Hankins was later awarded the prime contract, and it ultimately selected Jamison to do the electrical work. The parties signed their subcontract on February 24, 2010.

On the day the general contractor's bids were due to the Housing Authority, January 22, Jamison sent Hankins a document setting out fifty-five items that it wanted in any contract. Later that same day it submitted its $1.43 million bid by telephone. Among the fifty-five items were two that are relevant to the parties' disputes here. One stated: "Any and all backcharges/extra work/scheduling shall

be pre-approved in writing through Jamison Electric's main office by the project manager; the jobsite foreman does not have this authority." The other stated: "Once original construction schedule is mutually agreed upon any changes or alterations to that schedule must be again mutually agreed upon in writing." The parties had further negotiations over the terms of the subcontract, and when it was actually signed it had a number of written changes and an "Attachment A", which contained twenty-five items, many of which had been part of Jamison's original fifty-five, but some that were new. Of the two provisions listed above, the first one – requiring project manager approval – remained, but the second one – requiring written changes – was not included.

The Housing Authority/Hankins prime contract provided for a construction period of 730 days, from March 17, 2010 to March 19, 2012. Jamison knew this was the time period when it bid on the job. The Housing Authority provided Hankins with a "master schedule," which used up the entire 730 days, but Hankins did not provide that to Jamison. After consulting with the various subs, Hankins submitted to the Housing Authority and to the subs a schedule showing a construction period of March 17, 2010 to December 11, 2011, approximately four months shorter than the prime contract and master schedule allowed. Jamison agreed to this shorter schedule. The schedule contains many of the critical path

items, including what the parties refer to as "predecessors" and "successors," but it does not list all work to be done on the job; things that did not have to done at a particular time, such as electrical site work, are not listed on the schedule.

In general, the schedule provided that the mechanical, plumbing, and electrical (MEP) work would be done on a floor-by-floor basis, beginning on the tenth floor. The MEP work was in three parts: core drilling, rough-in, and finish work. For each floor, the schedule provided that Hankins would do the "layout" work before the MEP contractors did the core drilling work, then Hankins would do the light gauge framing (putting up the metal studs and other dividers for the floor), and only after that, the MEP contractors would perform the "rough-in" work. For the electrical subcontractor, this "rough-in" work is the bulk of the electrical work, and includes placing all boxes and back boxes that contain electrical switching and other equipment, installing conduits, and pulling the wiring for all the electrical systems.

Sometime in April, Hankins discovered that the need for asbestos abatement was much greater than previously contemplated, and it directed all the trades to stop work pending completion of the asbestos abatement. Before that date Jamison had done a limited amount of preliminary "make safe" work, such as de-energizing any existing power sources and providing a temporary power source

for the job.   Jamison was not able to work on the project between late April and mid-August 2010, and its work on the floors inside the building did not start until August.

After the asbestos abatement work was completed and the subs were able to return to the job, Hankins did not provide Jamison with any adjusted schedule similar to the schedule it had provided before.   Jamison asked Hankins for a schedule several times.   The Housing Authority also asked Hankins for a schedule.   The Housing Authority was also asking Hankins whether the electrical work was proceeding as expected, and Hankins reported that Jamison was ahead of schedule.   Without a formal schedule, the work progressed based on "three-week look-ahead" schedules.   The contractor and subs would hold weekly meetings and plot out what work would be done next.   Hankins' foreman, Wally Kolkmeier, advised Jamison on the areas that were ready for it to work on next.   Although Keith Jamison (from whom the Hundelts had purchased Jamison Electric) was technically the foreman during the first half of the job, in reality Brian Hundelt, technically the project manager, made most of the day-to-day decisions for Jamison throughout the job.

Brian Hundelt testified that it was crucial to his bid that Jamison never be required to do electrical rough-in work on any floor if the light gauge framing on

the entire floor had not been done.   Additionally, in his view, Jamison's electricians should never be required to do rough-in work on more than one floor at a time.   Jamison contemplated staffing the job with four electricians; most of the time that was the number of electricians who actually worked on the job. Sometimes all four electricians would be required to do non-rough-in work, such as building systems or site work.   On occasion when that happened, Hankins' foreman complained that no one was working on the floors, and asked Jamison to bring in additional workers.   For about six weeks in the middle of the job, Jamison had two additional electricians working on rough-ins.   For the most part, Jamison's electricians only performed rough-in work on one floor at a time, after the framing and after the mechanical and plumbing subs were finished, although some work on the floors, such as wiring on exterior walls, was occasionally done before that other work.

Each floor had approximately 10,000 square feet, in two different wings. All witnesses other than Hundelt testified that on a building such as this, there was ample room for multiple subs to be working on the same floor.   When the framers were finished with one apartment, Jamison's electricians could work on that apartment without being hindered in any way even if framers or mechanical and plumbing subs were working in other apartments on the same floor.   Similarly,

once the framing was completed on more than one floor, work was available for Jamison on multiple floors at once, and if Jamison had chosen to staff the job with multiple electricians, they could easily have been working on multiple floors at one time, which would have allowed them to complete their work sooner. Additionally, if Jamison had put more electricians on the job, some electricians could have been working on the floors while others performed tasks related to the building systems such as communications, fire alarm, etc.

For most of the job, the work proceeded as expected, with framers, mechanical subs, and plumbers working ahead of the electricians. Framing went faster than expected, so there were times Hankins' framers were more than one floor ahead of Jamison's electricians, and there were some times when Jamison did electrical rough-in work on more than one floor. It would take an electrician five or ten minutes to put his tools on a cart and ride the elevator to the next floor. There was no credible evidence that they were required to do this very often, or multiple times in a given work day, or that they had to go back and forth between floors an excessive amount.

In September 2010, Jamison wrote to Hankins and stated that if its schedule for the work was not adjusted because of the asbestos abatement delay, it needed additional compensation because Hankins was requiring it to work faster than

originally planned.   Hankins responded by saying a revised schedule would be provided, and also responded that it did not believe Jamison's work was affected by the delay, so it should not be compensated.

In February 2011, Hankins did provide Jamison a revised schedule.   Instead of providing for a later completion date, it had the same December 2011 completion date.   This revised schedule was not in a format that provided guidance to Jamison regarding how to schedule its work.   Instead, the work continued to be directed by the "three-week look-ahead" schedules that were issued as a result of the weekly construction meetings, and to be directed on a day-to-day basis by the Hankins foreman.   According to the payroll records, Jamison completed the bulk of its work by early May of 2012.

## A.     *Jamison's Extra Work Claims*

Jamison seeks compensation from Hankins for eight different things that it did that it claims were not part of the original contract.   Jamison submitted invoices for these items in April and May 2012, after its most of its work on the job was completed.

### *Invoice 1035 – Higher Amperage Required for Chiller – $2114.08*

The drawings and specifications indicated that the chiller on the roof required 400 amps.   Jamison based its bid on providing one conduit for this.

When the actual chiller arrived it required 600 amps, which required Jamison to provide an additional conduit and wires. The conduit needed to be installed before Hankins finished construction on the roof, and Jamison installed the two conduits under protest. Hankins hired another electrical contractor to do the wiring. Hankins requested and received a change order and additional compensation from the Housing Authority for this, and Hankins employees admitted that Jamison should be compensated for doing the work it did. The value of the work performed is the amount Jamison seeks, $2114.08.

### *Invoice 1037 – Mushroom Switches – $ 1279.06*

The boiler required emergency shut-down switches, which the parties refer to as interlocking or mushroom switches. The contract provided that the facilities management control systems subcontractor (also referred to as the temperature control subcontractor) was responsible for installing these switches. Hankins insisted that Jamison should do the work, and Jamison did it under protest. The value of the work performed is the amount Jamison seeks, $1279.06.

### *Invoice 1038 – 120V Circuit for Control Panel – $ 910.21*

Hankins claimed that Jamison, not the temperature control subcontractor, should install the power wiring for the control panels in the basement and penthouse. Jamison did this work under protest. Section 230933, paragraph

1.5.B of the specifications provides "110 VAC or greater voltage power wiring to main control panels (i.e. AHU's) as shown on the mechanical plans and/or specifications , shall be provided by Division 16 Contractor (Electrical) . . ." This was part of Jamison's contract obligations.

### *Invoice 1039 – Flow Switches – $ 2388.72*

Jamison contends the specifications required it to install either flow switches or tamper switches in the stairwells. Hankins contends it required both. Jamison installed both at Hankins' direction under protest. Jamison says the drawings show that either could be installed. Even if this is correct, the specifications refer repeatedly to flow switches *and* tamper switches. The prime contract, which is incorporated into Jamison's subcontract by reference, provides, at § 8.9, that where there is a conflict between the specifications and the drawings the specifications control.

### *Invoice 1042 – Pump and Alternator Panels – $ 6764*

Jamison seeks payment for providing an additional control panel for Pump 2. Two pumps were shown in the drawings. Jamison provided a Request for Information (an RFI is basically a request for clarification of the contract) and Hankins responded that two control panels were needed for these two pumps. When Jamison's subcontractor, GE, submitted its shop drawings, GE only

included one.   Because Hankins' engineer approved these incorrect shop drawings submitted by Jamison and its own subcontractor, Jamison argues that it should not have to pay.   But the engineer approval for the shop drawings occurred long after Jamison submitted its bid and the contract was signed, so Jamison's claim that it had to perform work that was not part of its original contract is simply wrong.

### *Invoice 1043 – Additional Light Fixtures – $6057.50*

In some instances the drawings showed light fixtures but did not specify the type of fixture.   Jamison did not include in its bid any amount for these light fixtures.   It later submitted an RFI and the fixture specifications were provided by the owner.   Jamison billed $15,258.74 for additional work for these fixtures, which was the full cost of the fixtures.   Hankins contended that Jamison was on notice that some kind of fixture was required, so it should not be able to obtain the full cost, but only the difference between some kind of basic fixture and what it actually provided.   Hankins requested a change order from the Housing Authority, which agreed with Hankins, and the Housing Authority paid Hankins $10,412.74 for the additional fixtures.   Hankins then paid Jamison that amount.   At trial counsel stated that the remaining balance on the claim is $6057.50, but the difference between what Hankins paid and what Jamison said it was owed is actually $4846.   I need not resolve this factual dispute, however, because Hankins

is correct that the contract obligated Jamison to provide the lights, so Jamison's failure to allocate anything to this item when it calculated its bid is its own fault.

### *Invoice 1044 – Lightning Protection – $5205.73*

The drawings specified four downleads for lightning rods, but Jamison's subcontractor, who was UL-approved to do this work, determined that five leads were required to meet the UL standards. The specifications required this work to be UL-approved, and so Jamison's failure to base its bid on what was required to meet UL requirements is not attributable to Hankins.

### *Invoice 1046 – Sensors – $1705.02*

The contours of this dispute are not clear, as the testimony changed during the trial and was not necessarily consistent with the documents. The claim is either for moving light sensors or other electrical equipment or for cutting new tile. (Jamison's witness changed his testimony regarding the scope of the claim several times, ultimately saying that the documentary evidence was incorrect.) In any event, Jamison installed sensors or other equipment in the hallways in the locations it says they were shown on the drawings, which were not necessarily in the center of the ceiling. Hankins' ceiling tile subcontractor cut holes in the middle of the tiles, because Hankins wanted a symmetrical look. Jamison billed for extra work, either for moving the devices or for cutting new tile. Regardless, Jamison's

insistence that it was appropriate to install the electrical equipment as it did – which Jamison says was exactly as shown on the drawings – ignores basic common sense. I do not believe that Jamison's workers carefully measured to scale the distances to be sure they were exactly in the same positions as they were shown in the drawings, and I credit the testimony of other witnesses who indicated that it is not practical to do this. The drawings had other items shown in the same area, and judgment was needed to place them appropriately. Jamison could have filed an RFI to clarify, or it could have installed them in a common-sense, uniform way. Jamison has failed to present sufficient evidence to show that it placed them exactly as shown on the drawings.

### *Invoice 1047 – Wiring and Receptacles for Alarms – $3622.44*

On direct examination Hundelt testified that this involved adding power for the fire alarm. The claims forms and his testimony on cross-examination established that the claim in fact relates to a variety of systems, including fire, CCTV, and intrusion detection systems. Hundelt testified that the drawings showed only one duplex outlet on the wall, not a dedicated circuit for the systems. Because the project engineer had signed off on the documents, Hundelt believed adding a dedicated circuit, which was eventually required by the fire marshal, was extra work. The contract provided that the electrical subcontractor was to "Be

responsible for designing and installing a complete fire alarm system that meets all codes." (Plf.'s Ex. 53, p. 8). Because it was Jamison's obligation to design the system, it was the one responsible for providing whatever power was required by the system it designed.

### *Invoice 1048 – Water Flow Tampers and Other Items – $ 3111.98*

This claim has several parts. The sprinkler contractor put in more heat detectors and tampers than had been shown on the drawings, so more wiring was needed than Jamison had anticipated. The fire marshal determined that two more heat detectors needed to be added in the penthouse, so Jamison ended up installing four instead of the two shown on the drawings. Jamison installed telephone lines to the main entrance for the fire alarm control panels, because the voice-activated fire alarm system required telephones, which were not shown on the drawings. Hankins requested an opinion from the owner, who said this was a coordination issue and referred to the specs. The specs provided that the electrical contractor was responsible for the systems. Again Jamison argues that because the engineer had approved drawings showing less than required, Hankins was required to pay for extra work. Jamison has not met its burden of showing that this was extra work.

<u>**B.    Hankins' Claims**</u>

Hankins has several specific items it contends it was required to perform either because Jamison did not do the work but should have, or because Jamison did the work improperly.   Hankins has withheld payment to Jamison for these items.

***Trenching for Lighting Conduit – $2145 and***
***Repair Broken Conduit – $4921.50***

Hankins has two separate claims regarding trenching and outside conduit. The witnesses appear to have conflated the claims, but when I consider all the evidence I find as follows. The trenching for electrical conduit was part of Jamison's site-work obligation, but Hankins actually did the work on a "time and materials" basis – in other words, Jamison hired Hankins to do the work. Jamison determined the "scope of the work," and so directed where the trenches were to be dug and how deep the trenches needed to be.   Hankins' excavator then dug the trenches to Jamison's specifications.   Brian Hundelt signed off on paying this cost, but then decided to withhold payment (in the amount of $2145) because of the second dispute.

The second dispute arose after Jamison had laid the lighting conduit.   The paving contractor struck some of the conduit.   Hankins says Jamison laid the conduit too close to the surface, but Jamison refused to repair the conduit, claiming

– 16 –

the error was Hankins' fault (and also refused to pay the trenching bill that it had already agreed was correct). But this damaged conduit problem occurred in a place where Hankins did not do any excavation, where Jamison in fact had laid the conduit very close to the surface. Hankins ultimately had the conduit repaired by another subcontractor, and claims that Jamison owes it $4921.50 for this work. Both of these items were Jamison's responsibility.

### Distribution Rack – $ 2129.15

The contract specifications (Deft.'s Ex. GG, p. 16) called for both a wall-mounted and a freestanding distribution rack. Jamison provided only the wall-mounted rack, contending that the freestanding rack was not necessary. When the owner insisted on both, as called for by the contract, Jamison refused. Hankins then provided the freestanding rack and withheld payment to Jamison for the cost, $2129.15.

### Bathroom Switches – $5580.75

Jamison installed the bathroom light switches on the hinge side of the door instead of the door-knob side of the door. The owner required Hankins to move the switches. Jamison refused to do the work, partly because it believed Hankins should have notified it of the problem sooner, when a mock-up had been completed. Ultimately the owner agreed that instead of moving the switches they

could install a light sensor, which did not cost as much as changing all the switches. Hankins billed Jamison $5580.75 for this change and withheld that amount from its payments. The contract required Jamison to install the switches on the knob side of the door.

### *Exit Lights – $4387.40*

Hankins claims Jamison had installed the exit lights in the elevator lobbies too far out in the corridors or too close to the doorways, so that they hung lower than the building code would allow. The city inspector required the lights to be moved, and Hankins billed Jamison for that work in the amount of $4387.40. Jamison claims that it should not have to pay this amount because it installed the lights according to the scale drawings. I do not find the argument that they were placed according to the scale drawings persuasive, and believe that placement in compliance with the applicable code was Jamison's obligation.

### *More Ceiling Tile Cutting – $2601*

Hankins withheld $2601 for costs it incurred in cutting acoustical ceiling tiles for smoke detectors and motion sensors. This is in addition to the issue discussed above. As with the issue discussed above, the evidence shows that this was Jamison's obligation under the contract.

### *Centrex Issue*

A Jamison supplier, Centrex, filed a claim against Hankins' payment bond of $18,777.01, which is money that Centrex claims Jamison failed to pay it. Hankins and the bonding company ask the court to require Jamison to indemnify them for any amounts they may be required to pay Centrex.   Brian Hundelt testified that part of this claim was for retainage it had withheld from Centrex because Hankins had withheld the retainage from Jamison, and the other part of this claim was for an extra VFD drive and alternator panels (the same issues raised in Jamison's invoice 1042 discussed above).   The evidence showed, however, that Hankins had paid Jamison the relevant retainage and Jamison had failed to pay its own supplier.   Jamison falsely certified on its own proof of claim on the bond that it had paid all subcontractors and suppliers.

### *Delay/Hinderance/Acceleration Claims*

Jamison seeks damages for acceleration, arguing that because the schedule was not adjusted to account for the time it could not work because of the asbestos abatement, it was forced to complete the work in less time than originally contemplated.   It calculates its claim for acceleration damages by subtracting the number of hours contemplated by its bid from the number of hours it actually worked.   This results in a damages claim for $223,491.84, based on 2359.5 hours

in excess of those it used to calculate its bid, at the rate of $94.72 per hour.

Hankins, in turn, claims that Jamison's slow work delayed the completion of the project, and it seeks an award for 35 days' worth of general conditions. Hankins attributes some of this to Jamison's refusal to complete or correct work it was required to do, but generally complains that Jamison did not put sufficient workers on the job to complete it in a timely manner. It calculates the amount of delay as $1331 per day, or $46,585, for the 35-day delay it claims.

Jamison's evidence showed that the number of hours it actually worked on the job was 12,414. Some of the documents used to calculate the bid show that the bid was based on an assumption that 11,600 hours would be needed, but exactly how that number was arrived at is not at all clear. The acceleration claim calculation exhibit says the number of hours on which the bid was based as 9600. That document says approved change orders added 50 hours. Jamison did 204.5 hours of additional work under protest. Another 250 hours were deducted to account for the normal risks on a job like this that the estimated hours might be too low.

Hundelt testified that the hourly rate of $94.72 was based on actual costs (the amount Jamison paid its electricians) of $74.88 per hour (consisting of $69.98 actual labor costs plus an additional amount for expendables and small equipment),

with the remainder being Jamison's overhead and profit.   The $94.72 rate is the rate that was allowed on the approved change orders during the project.

### *Contract Balance*

The parties engaged in various negotiations since the work was finished, but they agree that as of November 27, 2013, the balance unpaid by Hankins was $87,123.65.   Jamison seeks prejudgment interest at the rate of 9%.   It calculated the interest owed before the November 27, 2013 payment as $11,669.17.   It calculated the interest up to the date trial began as $1,306.86, and under its theory, the interest since trial would run at a rate of $653.43 per month.

The parties stipulated that the owner approved a pay application and made final payment to Hankins on November 21, 2012.

## II.    CONCLUSIONS OF LAW

This court has subject-matter jurisdiction over this dispute under 28 U.S.C. § 1352, because the United States Department of Housing and Urban Development provided funds for the project and required it to be bonded.   *See United States ex rel. Warren v. Kimrey*, 489 F.2d 339, 341 (8th Cir. 1974).

In the operative complaint, Jamison brings claims of breach of contract of the construction subcontract (Count I), quantum meruit (Count II), breach of contract of the payment bond (Count III), and vexatious refusal to pay (Count IV

against only surety Fidelity).

Hankins counterclaims for breach of contract (Count I), alternatively for unjust enrichment (Count II), and for indemnification to Centrex (Count III).

I conclude that Jamison has prevailed partially on its Count I by showing that Hankins unreasonably withheld the contract balance and, additionally, owes Jamison for a couple of extra work items. Under this Count Jamison is entitled to prejudgment interest. To the extent its Count II is not an alternative to Count I, it has failed to prove that claim. Jamison has also failed to prove its Counts III and IV because it did not wait ninety days after it completed work on the project to institute suit against Fidelity, in accordance with the terms of the payment bond. Jamison did not prove that it was entitled to penalty interest.

I also conclude that Hankins has prevailed partially on its Count I by showing Jamison did not complete all the work it was required to do under the subcontract. As such, its Count II for unjust enrichment is moot. Hankins has also prevailed on its Count III for indemnification because it has shown Jamison breached the subcontract by falsely certifying it had paid all its suppliers, including Centrex.

## A.   Jamison's Count I: Breach of Contract

To recover for a breach of contract under Missouri law, a plaintiff must

prove the existence and terms of the contract; that plaintiff performed under the contract; that defendant breached the contract; and that plaintiff suffered damages. *Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 104 (Mo. banc 2010). After reviewing all the evidence, I conclude that Jamison proved that Hankins breached the subcontract by failing to pay it the contract balance and as to two of the items of extra work, but not as to its "Acceleration/Obstruction/Delay Claim."

### *Jamison's Acceleration/Obstruction/Delay Claim*

Section 5 of the Jamison-Hankins subcontract is a so-called no-damages-for-delay clause that provides:

> Should the Subcontractor be obstructed or delayed in the prosecution or completion of the work by the act, neglect, delay or default of the Contractor . . . then the time herein fixed for the completion of the work shall be extended for a period equivalent to the time lost . . . ; but no such allowance shall be made unless a claim therefor shall be presented in writing to the Contractor within forty-eight hours of the occurrence of such delay and such extension of time has been approved by the Owner and the Architect or Engineer.

It continues:

> No payment or compensation of any kind shall be made to Subcontractor for damages because of hinderance or delay in the progress of the work from any [cause].

(Def.'s Ex. 2, Doc. 39.)

Missouri courts have not squarely ruled on the validity of no-damages-for-delay clauses like this one, but a state appellate court has suggested

that Missouri – like other jurisdictions – would enforce them as written. *Roy A. Elam Masonry, Inc. v. Fru-Con Const. Corp.*, 922 S.W.2d 783, 788–89 (Mo. Ct. App. 1996); *see also State ex rel. MWE Servs., Inc. v. Sircal-Kozeny-Wagner, JV*, 07CV4217 NKL, 2009 WL 482378, at *3–*6 (W.D. Mo. Feb. 23, 2009); *Baxter Int'l., Inc. v. Morris*, 976 F.2d 1189, 1196 (8th Cir. 1992). Although Missouri does not permit no-damages-for-delay clauses in public works contracts, *see* Mo. Rev. Stat. § 34.058(2), that exception does not apply here because Jamison and Hankins are both private parties. (*See* December 16, 2013 Mem. & Order, Doc. 42.) I conclude that Section 5 is valid under Missouri law.

### *Active Interference Exception*

Because no-damages-for-delay clauses have a "harsh effect," the Eighth Circuit "strictly construe[s]" them and applies several judicially created exceptions to their enforcement. *U.S. Steel Corp. v. Mo. Pac. R. Co.*, 668 F.2d 435, 438 (8th Cir. 1982). Jamison attempted to prove that the court should invalidate the clause under the "active interference" exception. In order for the principle of active interference to apply, I would have to conclude that Hankins "committed some affirmative, willful act in bad faith which unreasonably interfered with [Jamison's] compliance with the terms of the construction contract." *U.S. Steel*, 668 F.2d at 439 (citing *Peter Kiewit Sons' Co. v. Iowa S. Utils. Co.*, 355 F. Supp. 376, 399 (S.D.

Iowa 1973)).

The evidence presented at trial does not demonstrate any act by Hankins that would satisfy this standard.   Not only was there no credible evidence that Hankins *willfully* hindered Jamison's progress, there was no credible evidence that Jamison was hindered at all:   it always had access to areas it could have worked on. Because of the nature of the building and the speed at which the light gauge framing was completed, there was ample room for multiple subs to be working on the same floor and for Jamison to work on multiple floors simultaneously.   *See U.S. Steel*, 668 F.2d at 439 (quoting lower court, which found that no active interference had occurred until subcontractor no longer "had free choice and complete flexibility to reschedule its orders and its work force").   Though Jamison would have preferred to work on one floor at a time, and only after the framing was completed, its inability to do so, such as it was, does not constitute "active interference" by Hankins.

### Sequential Logic

Jamison argues that floor-by-floor electrical work was enshrined in the subcontract and that Hankins' refusal to abide by sequential scheduling – the "logic" of the project – constitutes a breach or perhaps supports a finding of active interference.   But nothing in the subcontract specifically protected Jamison's right to work on only one floor at a time.   *See U.S. Neurosurgical, Inc. v. Midwest*

*Div.-RMC, LLC*, 303 S.W.3d 660, 670 (Mo. Ct. App. 2010) (where a contract may be reasonably interpreted through its express terms, that is its meaning). Further, Jamison did not prove that it was delayed because Hankins prevented it from working on one floor at a time. *See, e.g., G.M. Shupe, Inc. v. United States*, 5 Cl. Ct. 662, 728 (1984) (calculating delay damages based on lack of access to "critical path" work items). In sum, to the extent that Hankins prevented Jamison from working on a single floor at a time, its actions did not breach the contract nor amount to "active interference" that would render Section 5 unenforceable.

### *Acceleration*

Courts disagree about whether damages for "delay" and "acceleration" are distinguishable. *See, e.g., Siefford v. Housing Auth. of City of Humboldt*, 223 N.W.2d 816, 820–21 (Neb. 1974) (discussing that state's precedents). As such, courts have split on whether a contractor may recover for damages caused by acceleration even though the governing contract contains an enforceable no-damages-for-delay clause. *Compare, e.g.*, *Samuel Grossi & Sons, Inc. v. U.S. Fidelity & Guar. Co.*, 2006 WL 3307465 (Pa. C.P. 2006) (disallowing acceleration claim) *and Contracting & Material Co. v. City of Chicago*, 314 N.E.2d 598, 604 (Ill. App. Ct. 1974) (allowing acceleration claim), *judgment rev'd on other grounds*, 349 N.E.2d 389 (Ill. 1976).

Here, Jamison claims Hankins breached the contract by accelerating its work in several ways:   (1) Hankins was given two years to complete the project (until March 2012), but only gave its subs an "accelerated schedule" of approximately 20 months (until December 2011); (2) when the project was delayed for unanticipated asbestos remediation, Hankins did not give Jamison an equivalent amount of time to catch up; (3) Hankins required Jamison to work on multiple floors at the same time; and (4) Hankins did not timely supply an appropriate schedule.   It also claims that Hankins did not grant it a time extension as requested in compliance with Section 5 of the subcontract.

Assuming without deciding that Jamison's acceleration claims are not barred by Section 5 of the subcontract, it has not proved that any of the above acts actually caused damage to Jamison by requiring it to spend more time on the job.   *See Truman Bank v. N. H. Ins. Co.*, 370 S.W.3d 675, 676-77 (Mo. Ct. App. 2012) (damage is essential element of breach-of-contract claim).   There is nothing in the Hankins-Jamison subcontract that required Hankins to give Jamison the same amount of time as it was given by the Housing Authority.   Despite Hundelt's testimony that the Housing Authority's 730-day deadline was important to Jamison's bid, Jamison eventually went ahead and worked under the pre-remediation accelerated schedule.   Though Jamison sometimes employed more

electricians than at other times, it has not shown that extra manpower was attributable to acts by Hankins.   It also has not shown that Hankins required it to work on multiple floors at the same time or that it was ever prevented from reaching the spots it needed.

It is true that the subcontract required Hankins to give Jamison schedules, and the three-week "look ahead" schedules did not fulfil that requirement.   Although the revised schedule belatedly provided after the asbestos remediation showed a December 2011 completion date, the fact is that the work was not completed until several months later and Jamison was not penalized in any way for failing to meet that deadline.   And Jamison has not shown that it was damaged in any way by the lack of explicit written schedules or written approval of schedule changes.

Finally, Jamison has attempted to quantify its acceleration claim based on a modified "total cost" approach, in which it compares the work-hours it estimated it would spend on the project at the outset and the actual number of work-hours it spent.   *See Moorhead Const. Co., Inc. v. City of Grand Forks*, 508 F.2d 1008, 1016 (8th Cir. 1975) (total-cost method of calculating damages not favored but may be applied in certain circumstances).   Even assuming that the estimate on which Jamison based its bid was reasonable, there is simply no credible evidence that the additional hours spent by Jamison are attributable to Hankins' acceleration of the job

rather than to Jamison's staffing choices or other factors. *See Brickey v. Concerned Care of Midwest, Inc.*, 988 S.W.2d 592, 594 (Mo. Ct. App. 1999) (in any action for breach of contract, plaintiff must have sustained damages *resulting from* defendant's breach).

*Refusal to Grant Time Extension/Constructive Acceleration*

Jamison also claims that it requested a time extension in accordance with Section 5 of the subcontract and that Hankins refused to grant the extension. Jamison argues that Hankins' refusal is itself a breach of contract.

First, Jamison did not prove that it made a request within 48 hours as required by the subcontract and therefore, it cannot demonstrate that Hankins breached by failing to grant an appropriate request. *See Schmelig Const. Co. v. Mo. State Highway Comm'n*, 543 S.W.2d 265, 269 (Mo. Ct. App. 1976) (where contractor did not follow contract procedure for requesting more time, "trial court correctly found no arbitrary refusal of extension of time"); *Marriott Corp. v. Dasta Const. Co.*, 26 F.3d 1057, 1068 (11th Cir. 1994) (contractor "waived the application of the no damage for delay clause by failing to make a proper request for an extension of time"); *Johnson Controls, Inc. v. Nat'l Valve & Mfg. Co.*, 569 F. Supp. 758 (E.D. Okla. 1983) (under Oklahoma law, subcontractor was not entitled to damages for constructive acceleration where it tripled its workforce, added night shift, weekends,

and overtime, but failed to give notice of need for extension as required by incorporated general contract).   Even if it had shown that it made a compliant request, Jamison would still not be entitled to damages because in reality, it *was* granted an extension of time.   Its certified payroll records show that it was still completing its work in June 2012, well after the ostensible December 2011 deadline. Moreover, to the extent Jamison demonstrated that it worked faster or out of sequence or hired more electricians than it otherwise would have, it did not show that these choices were attributable to Hankins.

*Attachment A and Section 5*

Jamison also argues that Section 5 of the subcontract (the no-damages-for-delay clause) cannot be enforced because it is inconsistent with this specifically negotiated term in "Attachment A": "Any and all backcharges/extra work/scheduling shall be pre-approved in writing through Jamison Electric's main office by the project manager; the jobsite foreman does not have this authority."

The evidence at trial demonstrated that this term was ignored by both parties for the duration of the project, and Jamison has waived its enforcement.   *See, e.g.*, *Wisch & Vaughan Const. Co. v. Melrose Props. Corp.*, 21 S.W.3d 36, 41 (Mo. Ct. App. 2000) ("Waiver of a writing requirement in a contract may be established by presenting evidence that the parties agreed to the changes and the changes were

completed."); *Flooring Sys., Inc. v. Staat Const. Co.*, 100 S.W.3d 835, 838 (Mo. Ct. App. 2003) (where owner had discussed and approved work changes with contractor numerous times, owner could not later avoid paying for the extra work by enforcing provision requiring written change orders). Moreover, even assuming Jamison had not waived enforcement of the requirement that scheduling changes be preapproved, it has not shown that working from the three-week look-ahead schedules caused it damage.

<u>Extra Work Claims</u>

As relates to the extra work claims, both parties proved breaches of the contract. Hankins breached the contract by failing to pay Jamison for the work it did, in accordance with the drawings and specifications, on the chiller and the mushroom switches. Hankins owes $3393.14 for that work. *See Ken Cucchi Const., Inc. v. O'Keefe*, 973 S.W.2d 520, 527 (Mo. Ct. App. 1998) (measure of damages is generally cost of repair or replacement). Jamison breached the contract by failing to pay Hankins for its trenching work, repair the lighting conduit, and install a freestanding distribution rack. It also breached by refusing to fix the bathroom switches, ceiling tile installations, and exit lights, which were all its responsibility under the subcontract. It owes Hankins for the cost of repairing those things, which Hankins proved was $21,764.80. *Id.* (burden is on

complaining party to prove damages).   Therefore, Hankins' net damages for the extra work claims are $18,731.66.

## Contract Balance

Jamison instituted this action on August 20, 2012.   At that time, the outstanding balance it claimed under the contract was $129,990.85.   The parties agree that on November 27, 2013, Hankins paid an additional amount previously disputed.   After that payment, Jamison claims the contract balance remaining to be paid was $87,123.65.   Taking the extra work claims into account, Hankins still owes Jamison a principal amount of $68,391.99.

## Prejudgment Interest on the Contract Balance

Jamison is also entitled to prejudgment interest on the contract balance as compelled by Missouri statute.   *See California & Hawaiian Sugar Co. v. Kansas City Terminal Warehouse Co., Inc.* 788 F.2d 1331, 1333 (8th Cir. 1986) (prejudgment interest in diversity action is determined by the law of the state in which the action arose); Mo. Rev. Stat. § 408.020 (setting annual interest rate at nine percent where no other rate is agreed upon); *Trinity Products, Inc. v. Burgess Steel, LLC*, 486 F.3d 325 (8th Cir. 2007) (award of prejudgment interest under Missouri law is compulsory, not left to the discretion of the court); *Hopkins v. Am. Econ. Ins. Co.*, 896 S.W.2d 933, 945 (Mo. Ct. App. 1995) (award of statutory

prejudgment interest promotes settlement and fully compensates plaintiffs).

Missouri law awards prejudgment interest in cases where the amount owed is "liquidated or, although not strictly liquidated, is readily ascertainable by reference to recognized standards." *California & Hawaiian*, 788 F.2d at 1333 (quoting *St. Joseph Light & Power Co. v. Zurich Ins. Co.*, 698 F.2d 1351, 1355 (8th Cir. 1983)). Here, the contract provided for a payment of a specific dollar amount, and Jamison fulfilled its obligations so as to be entitled to that amount (minus the offsets as described above). Even accounting for the extra work charges, the amount owed is easily measured and therefore interest has accrued. *See Children Int'l v. Ammon Painting Co.*, 215 S.W.3d 194, 203 (Mo. Ct. App. 2006) (interest applied if amount owed is "fixed and determined"); *Jerry Bennett Masonry, Inc. v. Crossland Const. Co., Inc.*, 171 S.W.3d 81, 90–90 (Mo. Ct. App. 2005) (retainage on contract balance due subcontractor was "readily ascertainable or computable amount of money comporting with the requirements of section 408.020").

Under Missouri law, interest on a claim of breach of contract begins to run when an amount becomes "due and payable" and "demand of payment is made." Mo. Rev. Stat. § 408.020. Here, the contract balance (minus the offset for the extra work claims) became due and payable on December 1, 2012, ten days after the Housing Authority made its final payment to Hankins, and Jamison made a

demand at that time.   Therefore, as calculated by Jamison, prejudgment interest

accrued on the whole amount Jamison claimed was due ($129,990.85) for just

under one year, for a total of $11,669.17.   This must be offset by the would-be

interest on the extra work claims.   *Walton Gen. Contractors, Inc./Malco Steel, Inc.*

*v. Chicago Forming, Inc.*, 111 F.3d 1376, 1384 (8th Cir. 1997) (collecting Missouri

cases and finding that under Mo. Rev. Stat. § 408.020, prejudgment interest awards

"must be reduced by the other party's offsetting recovery under a counterclaim for

breach of the same contract"); *Trinity Prods.,* 486 F.3d at 336 (allowing

prejudgment interest on jury's quantum meruit award for certain extra work

because those claims were readily ascertainable).   Subtracting that amount leaves

Jamison with a pre-November 27, 2013, interest award of $10,013.39.

Jamison also calculated the interest up to the date trial began as $1,306.86

(on the remaining $87,751.99), and under its theory, the post-trial interest since

trial has been running at a rate of $653.43 per month.   However, again, the extra

work claims Hankins won need to be subtracted from each of those calculations.

Subtracting the extra work claims leaves Jamison with $1,031.28 for pretrial

interest and $515.64 per month since then.   Therefore, in total, Jamison is owed

$16,201.07 in prejudgment interest.

## *Prompt Payment Act and Attorney Fees*

Jamison also seeks an additional award of penalty interest under Missouri's Public Works Prompt Payment Act, Mo. Rev. Stat. § 34.057. This statute provides, generally, that contractors must pay their subcontractors within fifteen days of receiving payment from a public owner, or else they face a monthly penalty of 1.5% interest on the amount owed. Mo. Rev. Stat. § 34.057.1(7); *see also Leo Jounragan Constr. Co. v. City Utils.*, 116 S.W.3d 711, 725 (Mo. Ct. App. 2003) (Prompt Payment Act is a "remedial statute and therefore requires liberal interpretation"). In order to award penalty interest, a fact finder must determine that the contractor withheld payment unreasonably and in bad faith. *See* Mo. Rev. Stat. § 34.057 (interest owed if payment is retained "without reasonable cause"); *see also City of Independence ex rel. Briggs v. Kerr Cons. Paving Co.*, 957 S.W.2d 315, 320 (Mo. Ct. App. 1997).

The statute explicitly protects a contractor's right to withhold payment from a subcontractor if it does not wish to certify that work to the public owner. Mo. Rev. Stat. § 34.057.2. In this case, however, Hankins did certify the project to the Housing Authority, including Jamison's electric work; it received full payment from the owner and then failed to pay Jamison the amount it owed. The statute also allows the contractor to withhold payment for disputed work. *Id.* Given that

– 35 –

both Jamison and Hawkins had claims regarding disputed work and that they each claimed the other had either delayed or accelerated the work, I conclude that Jamison's withholding payment as it did in this case was not unreasonable or in bad faith and so did not violate the Prompt Payment Act.

**B.** **Jamison's Counts III and IV: Breach of Payment Bond and Vexatious Refusal to Pay**

In its Count III, Jamison sued Hankins and its surety, Fidelity & Deposit Co. of Maryland, for breaching the payment bond by not releasing funds for the contract balance and extra work items. Similarly, in its Count IV, Jamison sued Fidelity for vexatious refusal to pay the remaining contract balance in accordance with the payment bond it issued. *See* Mo. Rev. Stat. §§ 375.296, 375.420; *DeWitt v. Am. Family Mutual Ins. Co.*, 667 S.W.2d 700, 710 (Mo. banc 1984). Under the vexatious refusal statutes, a surety is liable for additional damages for "without reasonable cause" failing to pay a claim within thirty days of an appropriate demand and "in accordance with the terms and provisions of the [governing] contract." Mo Rev. Stat. § 375.296; *see also Howard Const. Co. v. Teddy Woods Const. Co.*, 817 S.W.2d 556, 562 (Mo. Ct. App. 1991) (statute applies to sureties).

In this case, the bond only creates a cause of action once 90 days have elapsed since "the last of [the] claimant's work or labor was done or performed." (Pl.'s Ex. 2.) Jamison filed suit on August 20, 2012, which was less than 90 days

after the last of its work was performed. (*See* Pl.'s Ex. 105.) Since its lawsuit was not instituted in accordance with the terms and provisions of the payment bond, Jamison cannot prevail on its vexatious refusal claim.

Similarly, because Jamison did not fulfill its obligations under the payment bond by waiting 90 days to file suit, neither Fidelity nor Hankins can be said to have breached the bond, at least not yet. *See Frank Powell Lumber Co. v. Fed. Ins. Co.*, 817 S.W.2d 648, 652 (Mo. Ct. App. 1991) (ninety-day notice requirement was valid and "determined what notice was required in order for claimants who had no direct contract with Contractor to have coverage under the terms of the surety bond").

## C.    Hankins' Remaining Claim

### *Centrex's Claim on Payment Bond*

Among Hankins' counterclaims is a claim for indemnification for any obligation it has under the payment bond to Centrex, a Jamison supplier. *See Am. Nat. Prop. & Cas. Co. v. Ensz & Jester, P.C.*, 358 S.W.3d 75, 86 (Mo. Ct. App. 2011) (indemnitor has a legal duty to bear responsibility for indemnitee's liability to a third party); *Scheck Indus. Corp. v. Tarlton Corp.*, 435 S.W.3d 705, 731 (Mo. Ct. App. 2014) (upholding similar indemnification clause in contractor-sub contract); *Preatorian Ins. Co. v. Site Inspection, LLC*, 604 F.3d 509, 516 (8th Cir.

– 37 –

2010) (Missouri law does not require indemnification suits to be brought as third-party claims).

Under the subcontract, Jamison was required to fully pay all of its subcontractors and suppliers, to satisfy to Hankins upon demand that it had done so, and to indemnify and hold Hankins harmless against any claims from unpaid subcontractors and suppliers. (*See* Subcontract 6(c).) The evidence at trial showed, however, that Jamison breached this provision by not paying Centrex and by falsely certifying that it had paid all its subcontractors and suppliers. Therefore, Jamison must indemnify Hankins for any liability it might incur as a result of Centrex's demand.

## III. CONCLUSION

After reviewing all the evidence, I have concluded that Hankins breached the subcontract by not paying Jamison the contract balance, plus two items of extra work, and that Jamison breached the subcontract by failing to complete certain items of work it was obligated to do. I have also concluded that Fidelity is not liable under the payment bond or for vexatious refusal to pay because Jamison instituted suit too early and was therefore not in compliance with the terms of the bond. After totaling the parties' obligations, I have determined that Jamison's damages against Hankins, including prejudgment interest, amount to $84,593.06.

I will enter judgment in Jamison's favor in that amount.   Hankins will bear all taxable costs of this action.   I will enter judgment in Fidelity's favor on Jamison's claims of breach of the payment bond and vexatious refusal to pay.   I will also require that Jamison indemnify Hankins and Fidelity for any claim made by Centrex.   Judgment is entered separately.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 31st day of December, 2014.